**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James C. COUTCHAVLIS,**
**Defendant–Appellant.**

No. 00–10349.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 13, 2001.

Filed Aug. 15, 2001

Oliver E. Vallejo, Assistant Federal Defender, Fresno, California, for the defendant/appellant.

Stanley A. Boone, Assistant United States Attorney, Fresno, California, for the plaintiff/appellee.

Before: HILL,[1] GRABER, and McKEOWN, Circuit Judges.

McKEOWN, Circuit Judge:

James C. Coutchavlis appeals from a conviction for disorderly conduct, in violation of 36 C.F.R. § 2.34(a)(2), for which he was ordered to pay a fine of $100 and serve one year of probation. His primary challenge relates to interpretation of the regulation, which defines disorderly conduct as undertaking certain acts "with intent to cause public alarm, nuisance, jeopardy or violence," 36 C.F.R. § 2.34(a), and to the sufficiency of the evidence. We have jurisdiction pursuant to 18 U.S.C. § 3231, and we affirm.

### BACKGROUND

Coutchavlis was a bartender at the Ahwahnee Hotel in Yosemite National Park. His long-time friend and sometime girlfriend, Sheryl Peterson, was an employee of a cafeteria operated by Yosemite Concession Services in Curry Village. In early September 1999, the two took a drive in Couchavlis's car to Glacier Point, a scenic spot within the Park. During the drive from Glacier Point back to Yosemite Valley, on a road that is wholly within the boundaries of the Park, they got into an argument; Coutchavlis became agitated and began to yell at Peterson about their deteriorating relationship. According to Peterson, Coutchavlis, while driving, punched the windshield of the car, lengthening a pre-existing crack. He also grabbed her arm and activated the electronic door locks to keep her from leaving the car, and continued to drive.

Later that month, Coutchavlis brought flowers to Peterson at her workplace, but she rejected the offering, and her supervisor ordered him to leave. After her shift ended a few hours later, Coutchavlis was waiting for her in the parking lot. She immediately went back inside, and her supervisor called the park rangers. Yosemite National Park Ranger Arthur Gunzel responded to a report of the incident. He interviewed Peterson, the alleged victim, and learned of her history with Coutchavlis. She told him about the flowers/parking lot incident, as well as the events surrounding the drive down from Glacier Point.

Gunzel was unable to locate Coutchavlis that day, but, early the next day, he showed up unannounced at Coutchavlis's dorm room and informed him that he "was there to investigate an incident that had occurred at Curry Village." Coutchavlis's initial response was, "This involves Sheryl, doesn't it?" Gunzel said that he didn't want to discuss it right then but "needed to get an interview with him on what had happened, what had taken place, and invited him to do so." He let Coutchavlis go back into his dorm room to get dressed, and they proceeded outside. Gunzel suggested that they sit down at a picnic table outside the dorm, but Coutchavlis declined. Gunzel then suggested that they go back to his office, and Coutchavlis said, "That'll be fine." Gunzel had Coutchavlis sit in the back seat of the police car, but Gunzel informed him "that he was not in custody in any way."

Gunzel testified that he read Coutchavlis his *Miranda* rights once they arrived at the Yosemite Law Enforcement Office. Coutchavlis said that he wanted to continue with the interview. Gunzel acknowl-

---

**1.** Honorable James C. Hill, Senior Circuit Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

edged during cross-examination at the suppression hearing that he did not note in his interview report that he had given the *Miranda* warnings. After the interview, Gunzel offered to drive Coutchavlis "anywhere he needed to go in the Valley," and Coutchavlis accepted the offer.

During the approximately one-hour interview, Coutchavlis made several incriminating statements. At trial, Gunzel testified as to Coutchavlis's statements:

> He admitted to me that he had an inability to let go of the relationship, and further admitted that he had frightened her with his reckless driving behavior on the trip -
>
> . . . .
>
> He told me that he admitted that he had frightened her with his driving and that he had left her scooter disabled alongside of the road after a fight, an argument they had had.
>
> . . . .
>
> His statements to me were that she was the instigator of the argument and that he did admit to having kept her from exiting the vehicle because he wished to work things out, in his words.

Coutchavlis was tried before Magistrate Judge Hollis G. Best and convicted of disorderly conduct based upon the incident on the drive back from Glacier Point.[2] He was sentenced to pay a fine of $100 and a statutory assessment of $5, and to serve one year of summary probation. Coutchavlis appealed his conviction to the district court, which affirmed.

**2.** This case does not involve the alleged stalking incidents that sparked Ranger Gunzel's

## DISCUSSION

### I. JURISDICTIONAL REQUIREMENT—WITHIN THE BOUNDARIES OF YOSEMITE NATIONAL PARK?

Coutchavlis first contends that the government did not present evidence sufficient to prove that the violation of the regulation actually took place within Yosemite National Park. *See* 36 C.F.R. § 1.2(a)(1) ("The regulations contained in this chapter apply to all persons entering, using, visiting, or otherwise within: The boundaries of federally owned lands and waters administered by the National Park Service."). This argument ignores the realities of the Park's boundaries. According to Peterson's trial testimony, the windshield incident occurred somewhere between Glacier Point and the intersection at Chinquapin. An examination of a map of Yosemite demonstrates that the *only* route from Glacier point to the Chinquapin intersection travels *entirely* within the boundaries of the Park. *See* http://www.nps.gov/yose/ppmaps/yose-map1©pdf> (visited Aug. 8, 2001).

■ The magistrate judge, who actually holds court within the Park, could certainly take judicial notice of such a fact. *See* Fed.R.Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."). We have explicitly held that a court may take judicial notice of a map in determining whether a defendant known to have driven from one location to another passed through a particular jurisdiction. *See United States v. Trenary*, 473

initial investigation.

F.2d 680, 681 (9th Cir.1973). Coutchavlis *necessarily* remained within the Park while driving from Glacier Point to the Chinquapin intersection. Viewing the evidence in the light most favorable to the prosecution, it is reasonable to conclude that the incident took place within Yosemite—actually, there is no other reasonable conclusion. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (articulating standard of review for challenge to sufficiency of the evidence).

## II. SUFFICIENCY OF THE EVIDENCE

■ Coutchavlis next asserts that the government did not present evidence sufficient to sustain a conviction under the disorderly conduct regulation, 36 C.F.R. § 2.34(a)(2). The regulation provides:

> (a) A person commits disorderly conduct when, with intent to cause public alarm, nuisance, jeopardy or violence, or knowingly or recklessly creating a risk thereof, such person commits any of the following prohibited acts:
>
> . . . .
>
> (2) Uses language, an utterance, or gesture, or engages in a display or act that is obscene, physically threatening or menacing, or done in a manner that is likely to inflict injury or incite an immediate breach of the peace.

Coutchavlis's primary argument is that his actions in the car did not "knowingly or recklessly creat[e] a risk" of "public alarm, nuisance, jeopardy or violence" because acts undertaken inside a car cannot cause *public* alarm.[3] We interpret an administrative regulation de novo. *United States v. Albers*, 226 F.3d 989, 994 (9th Cir.2000),

*cert. denied* 531 U.S. 1114, 121 S.Ct. 859, 148 L.Ed.2d 773 (2001).

■ In *Albers*, we recently had occasion to explicate the word "public" as used in § 2.34(a). *Id.* at 995. Although *Albers* involved a conviction under subsection (a)(4), the word "public" appears in (a), which is common to both provisions, and thus the discussion is relevant here. The *Albers* court looked to the Model Penal Code, which defines "public" as "affecting or likely to affect persons in a place to which the public or a substantial group has access; *among the places included are highways . . . .*" Model Penal Code § 250.2(1) (1962) (emphasis added); *see also United States v. Taylor*, 258 F.3d 1065, 1068 (9th Cir. 2001)(relying on Model Penal Code in interpreting § 2.34); *United States v. Elmore*, 108 F.3d 23, 26 (3d Cir. 1997) (accepting Model Penal Code definition of disorderly conduct as "adequate . . . for purposes of federal law"). Thus the issue is not whether the public actually witnessed the act, but rather whether the act took place in a location accessible to the public. *See United States v. Mather*, 902 F.Supp. 560, 565 (E.D.Pa.1995) (noting that, "[w]hile . . . some places in the Park are less visible or open than others, this distinction cannot change the legal and practical reality that every square inch of the Park's grounds is public."); *United States v. Lanen*, 716 F.Supp. 208, 210 (D.Md.1989) ("The fact that the obscene actions are directed at a single person—in this case a police officer—does not make them private if they take place in a 'public' place.").

**3.** The government takes the position that the word "public" modifies only "alarm"' and that it therefore did not have to prove *public* nuisance, jeopardy, or violence. We recently rejected this interpretation of § 2.34, however, holding that "public" does modify each of those words. *United States v. Taylor*, 258 F.3d 1065, 1068 (9th Cir. 2001). The government is thus required to prove some sort of act with public attributes.

■ Given this legal backdrop, and viewing the evidence in the light most favorable to the prosecution, we have little doubt that a rational trier of fact could have found that Coutchavlis violated § 2.34(a)(2). By hitting the windshield hard enough to enlarge a pre-existing crack and locking the car door in an attempt to keep Peterson from exiting, Coutchavlis surely "engage[d] in a display or act that is ... physically threatening or menacing." *Id.*

It is also clear that a rational trier of fact could have concluded that, as the prosecution argued, Coutchavlis "knowingly or recklessly creat[ed] a risk" of "caus[ing] public alarm [or] nuisance." *Id.* The incident took place while the car was traveling on a public road. Although there was no evidence presented suggesting that anyone witnessed the incident, that is not the relevant inquiry; rather, what is relevant is whether the incident took place in a location "affecting or likely to affect persons in a place to which the public or a substantial group has access; *among the places included are highways* ...." Model Penal Code § 250.2(1) (emphasis added). As the incident took place on a highway, Coutchavlis's actions fall squarely within the Model Penal Code definition of "public," as adopted by the Ninth Circuit in *Taylor*, 258 F.3d at 1068, and *Albers*, 226 F.3d at 995. Given the threatening conduct in which Coutchavlis engaged while driving on a public highway, surely a rational trier of fact could conclude that he acted "recklessly" in creating a risk of public alarm or nuisance arising from a fear that the thrashing about behind the wheel might result in a crash. A rational trier of fact could conclude, as did the magistrate judge here, that Coutchavlis "deliberately disregarded a substantial and unjustifiable risk" that his actions would create a risk of public alarm. *Albers*, 226 F.3d at 995.

## III. CONSTITUTIONAL CHALLENGE TO 36 C.F.R. § 2.34

■ We decline Coutchavlis's invitation to hold that § 2.34 is unconstitutionally vague because it did not give him adequate notice that his conduct was prohibited. Whether a regulation is unconstitutionally vague is a question of law that is reviewed de novo. *Albers*, 226 F.3d at 992. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). The Supreme Court in *Hill* rejected the vagueness challenge on the ground that the statute in question contained "common words" ("protest, education, or counseling," "consent," "approaching") that "anyone" would understand. *Id.*

Here, as in *Hill*, the regulation contained only "common words," easily understandable by "people of ordinary intelligence." *Id.* The words of § 2.34 are not so obscure that they require any special skill to interpret. *See Mather*, 902 F.Supp. at 562 (§ 2.34 "is sufficiently plain on its face that we shall apply the ordinary meaning of its terms"). Coutchavlis does not argue, under the second prong of the *Hill* test, that the language of the regulation "encourages arbitrary and discriminatory enforcement." 530 U.S. at 732, 120 S.Ct. 2480. The regulation is not unconstitutionally vague; a person of ordinary intelligence could understand the words and would thus understand what conduct they prohibit.

## IV. FIFTH AMENDMENT CHALLENGE

■ Coutchavlis contends that the magistrate judge, in his comments explain-

ing the guilty verdict, demonstrated that he improperly shifted the burden of proof to the defendant in violation of his right to due process under the Fifth Amendment. Whether the magistrate judge improperly shifted the burden of proof to the defendant is reviewed de novo, *Dickey v. Lewis,* 859 F.2d 1365, 1370 (9th Cir.1988), as is the question whether a comment on the defendant's decision not to testify violates his right against self-incrimination, *United States v. Mayans,* 17 F.3d 1174, 1185 (9th Cir.1994). Specifically, Coutchavlis takes issue with the following comments by the magistrate judge:

> There has been no contrary evidence presented, so the court will find as a fact that he did punch out the windshield. That certainly is an act of violence.
>
> There is no contrary evidence and the Court finds it a fact that he did lock the doors on the vehicle, being a reasonable inference that he was trying to prevent her from leaving the vehicle. That's certainly a physically threatening or threatening act.
>
> Therefore, to that limited extent, the Court finds beyond a reasonable doubt that the defendant is guilty of the crime of disorderly conduct.

We find nothing conceivably improper about the second or third paragraphs; the magistrate judge was simply summarizing the evidence he had just heard at trial. The evidence presented at trial established that Coutchavlis did activate the door locks on the vehicle, and it is true that there was no evidence presented to the contrary.[4] A judge is permitted to comment on the evidence, as long as he does not " 'distort it or add to it,' " *White v. City of Norwalk,* 900 F.2d 1421, 1426 (9th Cir.1990) (quoting *Quercia v. United States,* 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321 (1933)), and he is in fact "constantly encouraged to state the reasons for his decision." *United*

*States v. Cox,* 439 F.2d 86, 88 (9th Cir. 1971).

The magistrate judge's statement in the first paragraph—"There has been no contrary evidence presented, so the court will find as a fact that he did punch out the windshield"—presents a closer question. Coutchavlis argues that the word "so" underscores the court's shifting of the burden. It is indeed possible to read the sentence as saying, "Because the defendant failed to present any contrary evidence, I therefore must find that he did punch out the windshield." Read this way, it would seem to place the burden on the defendant to come forward with evidence disproving the prosecution's case. This would, of course, violate Coutchavlis's Fifth Amendment rights in two ways: (1) by improperly shifting the burden of proof from the prosecution to the defense, *see Sandstrom v. Montana,* 442 U.S. 510, 524, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and (2) by improperly drawing a negative inference from his failure to testify on his own behalf and presumably rebut Peterson's accusations, *see Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

The magistrate judge's words, however, need not be read so literally. On appeal, our task is not to formally parse the sentences contained in a transcript of an oral ruling or to demand absolute linguistic precision from the trial judge. Rather, we must assure ourselves that the court did not tread on Coutchavlis's constitutional rights. Read in the context of the entire trial, it is more reasonable to interpret the magistrate judge's comment as meaning something like: "I have just finished a trial that included credible testimony that Coutchavlis punched the window. There was no evidence presented that would lead me to doubt that testimony. I therefore

---

4. Coutchavlis did contend that the electronic door locks were not functioning properly.

find as a fact that he did punch the window." That the magistrate judge did not orally explain his reasoning with the precision that might be expected from a written decision is not sufficient reason to conclude that he placed the burden on the defendant to prove his innocence or that he penalized him for not testifying in his defense. The magistrate judge simply evaluated the evidence presented at trial and explained, albeit somewhat inexactly, the reasoning for his conclusion that Coutchavlis had, beyond a reasonable doubt, committed a violation of § 2.34(a)(2).

## V. Miranda Challenge

■■■■ Coutchavlis argues that the magistrate judge erred in refusing to suppress the statements he made to Ranger Gunzel. According to Coutchavlis, the statements should have been suppressed because he was subject to custodial interrogation without being given *Miranda* warnings, and because his statements were involuntary. Whether a defendant is "in custody" for *Miranda* purposes is a mixed question of fact and law, which we review de novo. *Thompson v . Keohane,* 516 U.S. 99, 112–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The court also reviews de novo a district court's determination that a criminal suspect's statement to law enforcement officers was voluntary, but reviews for clear error the factual findings underlying that determination. *United States v. Wolf,* 813 F.2d 970, 974 (9th Cir.1987).

In ruling on Coutchavlis's motion to suppress, the magistrate judge focused on whether Coutchavlis was "in custody" and thus entitled to *Miranda* warnings before questioning. *See Oregon v. Mathiason,* 429 U.S. 492, 494–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). Because he determined that Coutchavlis was not taken into custody, there was no need to resolve the factual dispute over whether Gunzel actually administered the *Miranda* warnings.

■■■■ "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam) (citation and internal quotation marks omitted).

■■■■ There was no "formal arrest" of Coutchavlis. Officer Gunzel testified that he specifically informed Coutchavlis several times in the course of their interaction that he was not in custody, and Coutchavlis acknowledged that Gunzel told him at least twice that he was not in custody. After locating Coutchavlis in his dorm room, Gunzel offered to conduct the interview at the picnic tables outside the dorm; Coutchavlis declined the offer (because, speculated Gunzel, Coutchavlis did not want others to see him being questioned by a ranger). Gunzel offered to conduct the interview at his office instead, and Coutchavlis said, "[T]hat'll be fine." He was not handcuffed, and he never objected to Gunzel's request for an interview. After the interview, Gunzel offered to drive Coutchavlis "anywhere he needed to go in the Valley"; Coutchavlis accepted the offer and was driven back to his dorm.

■■■■ This series of events demonstrates that Coutchavlis was not taken into custody, either as part of a "formal arrest" or as part of a less formal "restraint on freedom of movement of the degree associated with a formal arrest." *Id.* at 322, 114 S.Ct. 1526. The fact that questioning takes place in a police station does not necessarily mean that such questioning constitutes custodial interrogation. *See Mathiason,* 429 U.S. at 495, 97 S.Ct. 711 (defendant not "in custody" where he "came voluntarily to the police station," "was immediately

informed that he was not under arrest," and, after questioning, "[left] the police station without hindrance"). This case is nearly indistinguishable from *Mathiason.* Because Coutchavlis was not in custody, he was not entitled to *Miranda* warnings, *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711, and thus the question whether Gunzel actually administered them is not relevant.

 Lastly, Coutchavlis challenges the voluntariness of his statements to Ranger Gunzel. The standard for voluntariness is set out in *United States v. Guerrero,* 847 F.2d 1363, 1366 (9th Cir. 1988):

> The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. *Haynes v. Washington,* 373 U.S. 503, 513–14, 83 S.Ct. 1336, 10 L.Ed.2d 513, (1963). A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194, (1976) quoting *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

(citations omitted.) Nothing in the record indicates that Coutchavlis was subject to physical or psychological coercion or that his will was overborne. There were no allegations of threats or promises. The factors pointed to by Coutchavlis as indicative of involuntariness (Gunzel's request for an immediate interview, riding in the back of the police car, Gunzel's police uniform and gun, and questioning without a lawyer present) are routine features of a non-custodial interview and simply do not, without more, suggest that Coutchavlis's statements were involuntary. As the Supreme Court observed in *Mathiason,* 429

U.S. at 495, 97 S.Ct. 711, "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." But the Court went on to recognize that just because such an interview may have "coercive aspects to it" does not mean that the suspect is in custody; neither can it mean that any interview with a uniformed officer at a police station necessarily renders a suspect's statements involuntary.

**AFFIRMED.**